JOSEPH TAYLOR GOOCH (SBN 294282)
Taylor.Gooch@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1 Front Street, Suite 3500
San Francisco, California 94111
Telephone:      (628) 235-1000
Facsimile:      (628) 235-1001

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS and UFW FOUNDATION, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| SONNY PERDUE, WILLIAM NORTHEY, and THE UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Defendants. | |

Plaintiffs United Farm Workers ("UFW") and UFW Foundation for their Complaint against Defendants Sonny Perdue, in his official capacity as United States Secretary of Agriculture; William Northey, in his official capacity as Under Secretary, Farm Production and Conservation; and United States Department of Agriculture (USDA) hereby allege as follows:

## INTRODUCTION

1.     The United States critically depends on approximately 2.5 million farmworkers located in rural communities from coast to coast to produce the nation's food supply and its agricultural exports.  Although they are essential to ensure continuity of the food that Americans consume every day, these farmworkers are highly vulnerable to wage decline, job loss, or other economic dislocation. Their jobs typically offer only subsistence wages, are often seasonal, and are vulnerable to economic shocks to agricultural markets.  Congress has charged defendant USDA, the U.S. Department of Labor (DOL), and other federal agencies with ensuring the economic security of farmworkers and the stability of agricultural production.  While Congress has authorized the entry of foreign agricultural guestworkers in unlimited numbers when the domestic labor supply is inadequate, Congress also charged DOL with protecting U.S. farmworkers' jobs and wages from the adverse economic consequences posed by the potentially limitless supply of foreign labor.   To discharge their Congressionally mandated duties, the defendant agencies depend on accurate data about the nation's farmworkers and agricultural labor markets.  Numerous state and local government programs and private entities similarly need such data to fulfill their obligations to assist farmworkers in achieving economic security and just living and working conditions.

2.     On September 30, 2020, USDA published a cursory, one-page notice (the Notice) in the Federal Register announcing that it was suspending the survey that serves as the premier source for data on the agricultural labor markets and the only source of information about hiring and wages paid by U.S. farms, the Farm Labor Survey (FLS), and ceasing publication of the biannual Farm Labor Report (FLR).  For over 100 years, USDA has consistently used the FLS to collect data about farm labor and wages.  The Notice abruptly ended that practice.

3.     Notwithstanding its decision to cast aside a century-old practice, USDA provided no rationale for the FLS's suspension and invited no public comment.  USDA announced—without any

elaboration—that it had "determined the public can access other data sources for the data collected in the [FLS]." After reciting a few proposed alternatives (again, without any analysis or discussion), the Notice flatly stated that USDA will no longer conduct the FLS or publish the FLR. USDA did not consider the detrimental impact its decision would have on farmworker wages or explain why it chose to eliminate a survey that so many federal and state entities have relied on for so long.

4.     USDA's decision to discontinue both the FLS (including the survey originally contemplated in October 2020) and the FLR (including the next publication in November 2020) will cause many hundreds of thousands of farmworkers already living on subsistence incomes to suffer significant wage cuts. Without FLS data, U.S. farmworkers and foreign guestworkers will be paid on average materially less per hour than what is currently permitted under H-2A regulations. For the typical, affected farmworker, the losses in annual income will amount to thousands or tens of thousands of dollars. Those wage decreases will send ripple effects throughout the farm labor market, ultimately resulting in many U.S. farmworkers being paid less as farms hire an increasing number of foreign laborers who can be paid lower wages than U.S. farmworkers currently receive.

5.     For a century, the FLS has regularly surveyed a nationally representative sample of farm employers. While the cadence of the survey has varied somewhat over the decades, the purpose and scope have remained fundamentally the same. The survey asks employers to report their employment statistics from a weekly pay period for each quarter, including information about wage rates and the number of field workers and livestock workers employed. The FLS provides the only national data on farm labor employment and wages rates paid by farms, as well as regional and seasonal (quarterly) data. Farm labor data collected by other means do not accurately reflect the agricultural labor market, and no alternative data set is an adequate substitute for the FLS.

6.     The uses of the FLS data are many-fold. FLS data are used to set minimum wages for hundreds of thousands of U.S. and foreign workers employed on farms participating in the H-2A visa program. These DOL-set wages are calibrated—using FLS data—so that the admission of H-2A guestworkers fulfills its statutorily mandated purpose of *supplementing* the domestic labor supply while protecting U.S. workers' wages from being undercut. FLS data are also necessary to administer various farmworker assistance programs and calculate accurate "parity prices" for crops,

prices that undergird numerous government economic programs and private production contracts. And many other public and private programs rely on FLS data to understand the farmworker population so they can efficiently deliver services.

7.    The information collected by the FLS is critical to DOL's administration of the H-2A agricultural guestworker program. FLS data are used to calculate the annual Adverse Effect Wage Rates (AEWRs), a minimum wage that must be paid by H-2A program employers. The AEWR is the primary wage rate under the H-2A program because it is used to calculate the wages paid to the vast majority of U.S. and H-2A visa workers employed at H-2A program employers. Eliminating the FLS would eradicate, or at least fundamentally alter, the AEWR. As a result, many employers would be allowed to pay farmworkers the federal or state minimum wage, which is often substantially less than the AEWR.

8.    The FLS plays a similarly important role in the administration of several federal aid programs for U.S. farmworkers and foreign guestworkers. The FLS, in tandem with other data sources, is used to allocate funding and other resources for the National Farmworker Jobs Program, administered by DOL; the Migrant and Seasonal Head Start Program, administered by the U.S. Department of Health and Human Services; and the programs assisting migrant farmworkers administered by the Legal Services Corporation—programs that provide economic, housing, professional, educational, and legal assistance to farmworkers. The FLS's unrivaled data on farmworker demographics helps ensure that public funds are efficiently targeted to farmworkers' needs.

9.    Moreover, USDA relies on FLS data to calculate parity prices for agricultural products and the parity index, a data set upon which economic planning and numerous farm support programs rely. The wages paid to workers hired by farms is an important component of the parity index and has been used in its calculation since 1933. Without these data, the parity index would be less representative of the expenses borne by U.S. farms and thus would be a less useful tool for protecting food production—and food producers—from market shifts and changes to agricultural prices. Protecting the agricultural sector from economic turmoil has been foundational to American economic policy for nearly a century, and numerous parties—including workers employed on

farms—would be affected if this protection was destabilized. Since data concerning the wages paid by farms are not collected outside of the FLS, it would not be possible to accurately calculate the statutory parity index if the FLS was suspended.

10.     Finally, the FLS, in combination with other data sets, provides the detailed information about the U.S. farm labor market required or otherwise relied upon by many other federal programs and in turn relied upon by states and private entities. For example, the FLS provides reliable regional and statewide information that can be combined with other data sources, such as the Agricultural Census, to estimate the number of farmworkers that reside in specific areas, which DOL relies on to determine whether domestic workers can satisfy farm labor demands. DOL's National Agricultural Workers Survey (NAWS) also uses FLS data to estimate the demographics of farmworkers by region and state on a yearly or seasonal basis. And other federal entities—including the congressionally mandated 1992 Commission on Agricultural Workers and the Congressional Budget Office—have long used the FLS in conjunction with other data sources to assess the farmworker population in the United States.

11.     In sum, the FLS has for over 100 years been a critical and unique component of the government's efforts to collect data on agricultural labor markets. Those data directly support substantial programs administered by both DOL and USDA, and they are used by the federal government in combination with other survey data to plan and implement policies and programs for farmworkers. In deciding to discontinue the FLS, USDA failed to explain its rationale for abruptly ending a century-old survey, and it failed to consider the numerous weighty interests that would be impacted by that decision. The decision is therefore arbitrary and capricious and an abuse of discretion. Moreover, USDA's action is procedurally defective under the Administrative Procedure Act. For those reasons, USDA's abrupt decision to discontinue the FLS and cease publication of the FLR should be enjoined.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over this action for review of final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and 28 U.S.C. §§ 2201-2202 (declaratory and further relief).

13.   Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendant USDA is an agency of the United States and officers acting in their official capacity, no real property is involved in this action, plaintiff UFW resides in the District, and the challenged regulations impact tens of thousands of farmworkers in the District.

## INTRADISTRICT ASSIGNMENT

14.   This action involves legal challenges to final agency action that adversely affects Plaintiff UFW, which has its headquarters in Kern County, and thousands of farmworkers living and working in Kern County and elsewhere in the Fresno Division.  Assignment of this case to the Fresno Division is therefore proper under Civil L.R. 120(d), because a significant portion of the impacted farmworkers live or work in or adjacent to counties within that division.

## PARTIES

15.   Plaintiff United Farm Workers is the nation's first successful and largest farmworkers' union with a total membership of over 45,000 members across the nation, including farmworkers, both U.S. and foreign, employed at employers that participate in the H-2A temporary foreign worker program.   UFW is headquartered in Keene, California, and maintains offices in Oregon and Washington State, and has a substantial membership in numerous other states, including in Idaho, Arizona, and New Mexico.   UFW's mission is to support the rights and interests of farmworkers, including advocating for wages and workplace safety, and to provide farmworkers with the tools that they need to succeed.  UFW provides services and information to hundreds of thousands more farmworkers through social media efforts and a text membership program that reach farmworkers in over thirty states throughout the United States, and through partnerships with La Campesina radio network and a network of organizations that provide services to farmworkers, including the UFW Foundation, Cesar E. Chavez Foundation, La Union del Pueblo Entero, and the National Farmworker Service Center. UFW and its members are particularly interested in farmworker wages. UFW's members have relied on and benefitted from the yearly AEWR wage standards that operated as a floor protecting UFW-member farmworkers who work for H-2A program employers. Suspension of the FLS and the consequent impairment of the AEWR standard would therefore result in substantial decreases to UFW members' wages.  UFW brings this action on behalf of its members

and farmworkers who rely on those AEWR wages and would suffer substantial harm because of USDA's decision.

16.     Plaintiff UFW Foundation, a sister organization to UFW, is a dynamic non-profit organization established in 2006 with the core purpose of empowering communities to ensure human dignity.  The UFW Foundation has staff serving farmworkers and low-income immigrants in California, Arizona, Washington, Oregon, and Michigan.  It serves over 100,000 farmworkers across the United States.  Through worker engagement and legislative advocacy, the UFW Foundation seeks to advance the rights of farmworkers.  In 2019, the UFW Foundation served over 100,000 farmworkers and low-income community members in California and Arizona.  More recently, the UFW Foundation has distributed emergency relief to farmworkers during the pandemic.  At least $11 million in financial assistance is being provided to over 22,000 farmworkers in California, Oregon, and Washington by November 2020.  The UFW Foundation also helped to distribute 189,000 meals and over 27,000 food boxes to California farmworkers in 2020.  The UFW Foundation's work and members are directly impacted by increased poverty among farmworkers; as such, the UFW Foundation, its members, and farmworkers across the United States will be harmed by USDA's action.  The UFW Foundation has also coordinated the distribution of over 300,000 masks in rural farmworker communities in California, Oregon, Washington, and Michigan since March 2020.  In 2019, the UFW Foundation led a campaign to submit over 80,000 public and farmworker comments regarding the DOL's proposed rule to enact a series of regulatory changes to the H-2A foreign guestworker visa program.  At the federal level, the UFW Foundation and its farmworker members have educated legislators about the need for basic labor protections for both H-2A guestworkers and U.S. farmworkers.  The UFW Foundation brings this action on behalf of itself and its members and farmworkers who have benefited and will benefit from the services it provides, and who would be harmed by USDA's decision.

17.     Defendant Sonny Purdue is the United States Secretary of Agriculture.  The Secretary is ultimately responsible for all functions of the United States Department of Agriculture, including administration of the Farm Labor Survey.  He is sued in his official capacity.

18.     Defendant William Northey is the Under Secretary for Farm Production and Conservation at USDA. He is sued in his official capacity.

19.     Defendant United States Department of Agriculture is a federal agency of the United States. It is responsible for administering the Farm Labor Survey.

## FACTS

### A.     The Farm Labor Survey

20.     Federal law instructs the Secretary of Agriculture to procure and preserve information concerning agriculture, including "by the collection of statistics" and "any other appropriate means within his power."[1]

21.     Since 1910, the Secretary has satisfied that statutory mandate in part by conducting the Agricultural Labor Survey, often referred to as the Farm Labor Survey.[2]  The FLS collects information from farm employers to obtain data on farm employment, hours worked, wages paid, and other statistics.  Thus, for over 100 years, USDA has consistently employed the FLS to collect data about farm labor and wages.[3]

22.     The FLS is traditionally conducted in April and October.  During those months, the survey collects wage and employment data for four reference weeks, one in each quarter, from farms and ranches with $1,000 or more in annual agricultural sales revenue for all states except Alaska.[4]  The FLS samples approximately 35,000 farms and ranches.[5]  Most FLS data is collected by mail and computer-assisted phone interviews, with personal interviews used for some large operations and those with special handling arrangements.[6]  The October 2020 survey is expected to be

---

[1] 7 U.S.C. § 2204(a).

[2] *See* Daberkow & Whitener, *Agricultural Labor Data Sources: An Update* 6 (Aug. 1986).

[3] From 1910 to 1974, the FLS was conducted on a monthly basis.  From 1974 through the second quarter of 1981, as well as from 1984 to the present (with limited exceptions), the survey was conducted on a quarterly basis.  In 1982 and 1983, the survey was conducted once per year.  *See* Daberkow & Whitener, *supra*, at 6.

[4] USDA NASS, *Farm Labor Methodology and Quality Measures* (May 28, 2020), https://www.nass.usda.gov/Publications/Methodology_and_Data_Quality/Farm_Labor/05_2020/farm_labor_qm.pdf.

[5] *Id.*

[6] *Id.*

conducted from on or about October 19, 2020 through on or about November 7, 2020, and the FLR is expected to be published in or about the week of November 23, 2020.[7]

23.     The National Agricultural Statistics Service (NASS)—USDA's statistical branch—publishes FLS data semiannually in May and November in the FLR.  The May report includes employment and wage estimates based on January and April reference weeks, and the November report includes estimates based on July and October reference weeks.[8]  The report includes quarterly estimates of the number of hired workers and average hours worked per worker during each reference week.  It also includes quarterly estimates of average hourly wage rates for field workers, livestock workers, field and livestock workers combined, and all hired workers (including supervisors/managers and other workers).[9]  The November report also provides annual data based on the quarterly estimates.[10]

24.     For example, the November 2019 FLR disclosed that 809,000 workers were hired directly by farm operators during the week of October 6-12, 2019, a 3% increase from the prior year.  Those workers were paid an average gross wage of $15.02 per hour during that reference week, up 4% from October 2018, and the wage rate for field and livestock workers combined was $14.21 per hour, up 4% from the 2018 reference week.[11]  The November 2019 FLR also stated that for hired workers the "annual average gross wage rate was $14.91 per hour, up 5 percent from the 2018 annual average gross wage rate."[12]

25.     The most recent FLR, published on May 28, 2020, reported that there were 688,000 workers hired directly by farm operators during the week of April 12-18, 2020, reflecting a 9% increase from April 2019.[13]  These workers were paid an average gross wage of $15.07 per hour

---

[7] *See id.*

[8] *See* USDA NASS, *Farm Labor:  Get the Data*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Oct. 9, 2020).

[9] *Id.*

[10] *Id.*

[11] USDA, *Farm Labor* (Nov. 21, 2019), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/c821h164m/fq9788943/fmla1119.pdf.

[12] *Id.*

[13] USDA, *Farm Labor* (May 28, 2020), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/n583zg017/dn39xm85z/fmla0520.pdf.

during the April 2020 reference week, up 2% from the prior year.  The combined wage rate of field and livestock workers was $14.16 per hour, up 3 percent from the April 2019 reference week.  For the January 2020 reference week, the wage rate for field and livestock workers combined was $14.20 per hour, up 3 percent from the January 2019 reference week. These wage increases suggest that the 2020 wage rates would have been found to be higher than the corresponding 2019 wage rates had USDA conducted the survey in October and published the November FLR.

**B.    USDA's Decision To Discontinue The Survey**

26.    On September 30, 2020, USDA announced the suspension of October 2020 FLS data collection and the cancellation of its November 2020 publication of the biannual FLR.[14]  USDA did not solicit any public comment or employ formal rulemaking procedures.[15]  This Notice amounts to final agency action with respect to the suspension of FLS data collection and FLR publication.

27.    The Notice provides no rationale for suspending the FLS data collection or FLR publication.

28.    The Notice acknowledges some of the many uses of FLS data.[16]  The Notice asserts, however, that "USDA has determined the public can access other data sources for the data collected" by the FLS.  It does not explain how those alternative data sources will replace the unique data that FLS collects on farmworkers and agricultural labor markets.  Nor does it consider how eliminating the FLS will affect the federal programs and services that rely on the FLS data.

29.    The Notice also does not consider how the decision to discontinue the FLS and FLR will prevent DOL from computing AEWRs under the H-2A program, or the resulting lower wages for both U.S. and H-2A farmworkers.  Nor does the Notice address the serious harm that H-2A and U.S. farmworkers—who disproportionately work for subsistence wages—will suffer from these wage cuts.

---

[14] Notice of Revision to the Agricultural Labor Survey and Farm Labor Reports by Suspending Data Collection for October 2020, 85 Fed. Reg. 61719 (Sept. 30, 2020).
[15] *See id.*
[16] *See id.* ("Number of workers and hours worked have been used to estimate agricultural productivity; wage rates have been used in the administration of the H–2A Program and for setting Adverse Effect Wage Rates. Survey data have also been used to carry out provisions of the Agricultural Adjustment Act.").

### C.   USDA, DOL, And Others Recognize That The Farm Labor Survey Plays A Critical Role In Administering Federal And State Programs

30.   USDA recognizes that the FLS and the agricultural labor statistics the survey provides "are an integral part of [NASS's] primary function of collecting, processing, and disseminating current state, regional, and national agricultural statistics."[17]   "The Agricultural Labor Survey," the USDA has explained, "is the *only* timely and reliable source of information on the size of the farm worker population."[18]

31.   The FLS provides information about farmworker labor and wages that is critical to the administration of several federal programs.   USDA recognizes, for example, that "[c]omprehensive and reliable agricultural labor data are … needed by [DOL] in the administration of the 'H-2A' program."[19]   Specifically, "[t]he annual weighted average hourly wage rate for field and livestock workers combined" collected by the FLS "is currently used as the Adverse Effect Wage Rate in administration of the H-2A Program," "the provision under the Immigration Reform and Control Act that allows admission of temporary non-immigrant alien farm workers to perform farm labor or services of a temporary or seasonal nature."[20]

32.   FLS data is also used to administer several other federal programs that aim to assist migrant and seasonal farmworkers.   Those programs, which include the National Farmworker Jobs Program, the Migrant and Seasonal Head Start Program, and the Legal Services Corporation Migrant Program, use information about farmworker populations collected by the FLS to allocate federal resources.

33.   The farmworker wage rates collected by the FLS also "help [USDA to] measure the changes in cost of production of major farm commodities" and "to compute parity prices of farm products," a calculation that the USDA is mandated by statute to publish.[21]   A number of

---

[17] *Submission for OMB Review; Comment Request*, 83 Fed. Reg. 50631, 50632 (Oct. 2, 2018).
[18] *Id.* (emphasis added).
[19] *Id.*
[20] USDA NASS, *Farm Labor: About the Survey*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Oct. 9, 2020).
[21] *Id.*

administrative acts require use of parity prices, including the Agricultural Marketing Agreement Act of 1937, the Food and Agricultural Act of 1977, and the Agriculture and Food Act of 1981.[22]

34.     The FLS also plays an important role in ensuring that the federal government has an accurate understanding of the farmworker population in the United States.   FLS data, when combined with other data sources, offers substantial statistical insights into the farmworker community.

35.     Beyond those uses, the FLS provides important information about farm labor that is used in a variety of ways.   USDA acknowledges that "[t]he employment and wage estimates published in the FLR are used by federal, state, and local government agencies; educational institutions; farm organizations; and private sector employers of farm labor."[23]   For example, the FLS is "used by farm worker organizations to help set wage rates and negotiate labor contracts as well as determine the need for additional workers and to help ensure federal assistance for farm worker assistance programs supported with government funding."[24]   USDA likewise recognizes that "[t]he data that farm operators provide through NASS's Agricultural Labor Survey allow federal policymakers to base farm labor policies on accurate information."[25]

1.     **DOL Relies On Farmworker Wage Information Collected By The FLS To Administer The H-2A Program**

36.     The H-2A agricultural guest worker program permits agricultural employers to hire foreign workers to perform agricultural work on a temporary basis when domestic labor markets cannot supply adequate workers at a particular time for a certain job.   Employers are only authorized

---

[22] USDA NASS, *Price Program: History, Concepts, Methodology, Analysis, Estimates, and Dissemination – Chapter Four – Parity Prices, Parity Ratio, and Feed Price Ratios* (2011), https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Prices/Price_Program_Methodology_v10.pdf.
[23] USDA NASS, *Farm Labor: About the Survey*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Oct. 9, 2020).
[24] 83 Fed. Reg. at 50632.
[25] News Release, *USDA Gathers Data About On-Farm Labor* (Mar. 25, 2019), https://www.nass.usda.gov/Statistics_by_State/Oregon/Publications/Current_News_Release/Ag%20Labor%20Survey_News%20Release.pdf.

to hire foreign guestworkers, however, if DOL certifies that the foreign workers' temporary employment "will not adversely affect the wages and working conditions of workers in the United States similarly employed."[26]  And DOL has recognized, as a general matter, that the introduction of foreign guest workers makes wage stagnation or depression likely to occur.[27]

37.    To avoid adverse effects to U.S. workers' wages, DOL regulations require that employers utilizing the H-2A program pay a wage that is the highest of the Adverse Effect Wage Rate (AEWR), the prevailing wage rate, an agreed-upon collective bargaining wage, or the federal or state minimum wage.[28]

38.    Under those regulations, DOL relies primarily on a two-pronged approach based on the AEWR and prevailing wage rate to guard against wage depression that would otherwise result from the hiring of large numbers of foreign agricultural workers.[29]  The prevailing wage rate protects local wages paid for particular jobs, while the AEWR sets a state-wide wage floor to prevent wage disparities over larger areas and all the jobs at H-2A employers in that area.  DOL has recognized that it is the existence of both the AEWR and prevailing wage rates that ensures that U.S. workers are adequately protected from decreased wages caused by an influx of foreign guest workers.[30]  The AEWR, however, is the primary wage rate under the H-2A program because it is higher than the other minimum wages in most circumstances.[31]   As a result, the AEWR determines the wages of approximately 92% of the farmworkers at H-2A program employers.[32]

39.    DOL's regulations have required it to use the FLS to calculate the AEWR for the H-2A program since the program's inception in 1986, and it had used FLS data for the H-2A's

---

[26] 8 U.S.C. § 1188(a).
[27] *See Temporary Agricultural Employment of H–2A Aliens in the United States*, 75 Fed. Reg. 6884, 6892 (Feb. 12, 2010); *Temporary Agricultural Employment of H–2A Aliens in the United States*, 74 Fed. Reg. 45906, 45911 (Sept. 4, 2009).
[28] *See* 20 C.F.R. 655.120(a); *Temporary Agricultural Employment of H–2A Nonimmigrants in the United States*, 84 Fed. Reg. 36168, 36265 (July 26, 2019).
[29] *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States; Adverse Effect Wage Rate Methodology*, 54 Fed. Reg. 28037, 28040, 28045 (July 5, 1989).
[30] *See* 75 Fed. Reg. at 6893.
[31] *See* 84 Fed. Reg. at 36179.
[32] *See id.*

predecessor program since 1953.[33]  Because of DOL's longstanding reliance on the survey, USDA conducts the FLS in cooperation with DOL,[34] and DOL has funded the FLS since July 2011 pursuant to a memorandum of understanding between the agencies.[35]

40.     In 2010, DOL recognized that using data other than the FLS to calculate AEWRs "entails a significant risk that U.S. workers may in the future experience wage depression as a result of unchecked expansion of the demand for foreign workers."[36]  DOL explained that "[t]he FLS is the only annually available data source that actually uses information sourced directly from farmers," which "is a strong advantage of the FLS as the AEWR data source compared to all other alternatives."[37]

41.     DOL similarly explained in a 2019 notice of proposed rulemaking that "[t]he FLS [remained] the Department's preferred wage source for establishing the AEWR because it is the only comprehensive wage survey that collects data from farm and ranch employers."[38]  DOL also recognized that it had "always used the FLS to set the H-2A AEWR, with the exception of a brief period under" its 2008 rule.[39]

## 2.     Federal Agencies Rely On FLS Data To Administer Federal Aid Programs For U.S. Farmworkers and Guestworkers

42.     The FLS plays a significant role in the administration of several federal government programs that aim to assist U.S. farmworkers and other stakeholders, including the National Farmworker Jobs Program, Migrant and Seasonal Head Start programs, and the Legal Services Corporation Migrant Program.

43.     The National Farmworker Jobs Program (NFJP) is a locally administered program overseen by DOL that provides services for migrant and seasonal farmworkers.  The program

---

[33] *See* 54 Fed. Reg. at 28039-28040.

[34] USDA NASS, *Farm Labor: About the Survey*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Oct. 9, 2020).

[35] *See* 84 Fed. Reg. at 36178; USDA NASS, *2020 Guide to Products and Services* 11 (Nov. 2019), https://www.nass.usda.gov/Publications/catalog.pdf.

[36] 75 Fed. Reg. at 6898.

[37] *Id.*

[38] 84 Fed. Reg. at 36180.

[39] *Id.*

provides grants to community organizations and state agencies across the United States that offer career services and training, youth services, related assistance services, and housing assistance to farmworkers.[40]   These services include referrals of job applicants to agricultural employers that submit requests for assistance in finding workers.   Those grants will provide approximately $95 million in assistance to migrant and seasonal farmworkers in 2020 alone.[41]   DOL relies on average hourly earnings data from the FLS, along with other information, to apportion NFJP funding.[42]

44.     Migrant and Seasonal Head Start (MSHS) programs—first established in 1969 and administered as part of the broader Head Start program by the U.S. Department of Health and Human Services (HHS)—provide early education, nutrition, and health services to children of agricultural workers and their families.   Among other things, the programs provide high-quality learning experiences for children up to five years' old and helps connect children and families to critical health and nutrition services, including medical and dental screenings, mental health services, and referrals to public assistance programs.   As of 2017, 62 MSHS programs received federal funding to serve 28,591 children in 38 states.[43]   Office of Head Start within HHS relies on FLS data to estimate the number of MSHS-eligible children in the United States, as required by the Improving Head Start for School Readiness Act of 2009 (codified at 42 U.S.C. § 9844).[44]

---

[40] *See* DOL Employment and Training Administration, *National Farmworker Jobs Program*, https://www.dol.gov/agencies/eta/agriculture (last visited Oct. 9, 2020).

[41] DOL Employment and Training Administration, *Career Services and Training Grants*, https://www.dol.gov/agencies/eta/agriculture/grants/career-services (last visited Oct. 9, 2020) (listing over $88 million in 2020 grant award amounts); DOL Employment and Training Administration, *Housing Grants*, https://www.dol.gov/agencies/eta/agriculture/housing (last visited Oct. 9, 2020) (listing over $6 million in 2020 housing grant awards).

[42] *See Program Year (PY) 2019 Workforce Innovation and Opportunity Act (WIOA) Section 167, National Farmworker Jobs Program (NFJP) Grantee Allotments*, 84 Fed. Reg. 33087, 33088 (July 11, 2019).

[43] *See* HRSA, *Effective Partnerships Guide* (2018), https://eclkc.ohs.acf.hhs.gov/sites/default/files/pdf/effective-partnerships-guide-oral-health-mshs-v3.pdf.

[44] *See* HHS Office of Planning, Research, and Evaluation, *Migrant and Seasonal Head Start Supplement to the National Agricultural Workers Survey 2015 Report* (Mar. 2015), https://www.acf.hhs.gov/sites/default/files/opre/2015_mshs_supplement_to_naws_report_ii_1_2016_pdf_compliant.pdf.

45.     The Legal Services Corporation (LSC) is a federally created and funded non-profit organization that promotes equal access to justice and provides grants for civil legal assistance to low-income Americans.  As part of those efforts, LSC provides separate grants to address the legal needs of agricultural workers and their dependents.  LSC funds those grants on a per-capita basis using data about agricultural worker populations living in poverty.[45]  It estimates those agricultural worker populations using data obtained from NAWS, which in turn relies on FLS data to derive its estimates.[46]

### 3.     USDA Relies On FLS Data To Calculate Parity Prices Under the Agricultural Adjustment Act

46.     The USDA utilizes FLS data in programs that ensure the stability of the agricultural sector and protect agricultural businesses and their workers from the adverse effects of volatile agricultural markets.  As part of this effort, USDA calculates "parity prices" for each crop that represent a comparison of the market prices received for a commodity with its costs of production, including the cost of farm labor, and farmers' living expenses.[47]  These prices assist USDA in preventing prices paid to farms for agricultural commodities from falling below the cost of producing those products.  Private parties also frequently reference parity prices in agricultural contracts.

47.     USDA recognizes that FLS "wage rate data are used to compute a wage rate index, a component of the parity index used to compute parity prices of agricultural products," which "are

---

[45] LSC, *Basic Field – Agricultural Worker Grants*, https://www.lsc.gov/grants-grantee-resources/our-grant-programs/basic-field-agricultural-worker-grants (last visited Oct. 9, 2020).

[46] *See Final Agricultural Worker Population Estimates for Basic Field—Agricultural Worker/Migrant Grants*, 81 Fed. Reg. 52461, 52463 (Aug. 8, 2016).

[47] The parity price of a commodity is the product of the adjusted base price of that commodity (calculated by dividing the average of the price of that commodity during the previous ten years by the ratio of the general level of prices received for that commodity between 1910 to 1914) and the parity index. USDA NASS, *Price Program: History, Concepts, Methodology, Analysis, Estimates, and Dissemination – Chapter Four – Parity Prices, Parity Ratio, and Feed Price Ratios* p. 4-8 (2011), https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Prices/Price_Program_Methodology_v10.pdf.

computed as a provision of the Agricultural Adjustment Act as amended."[48]  Without FLS data, the calculation of the parity index would be incomplete because it would not account for the wages paid to hired farm labor.[49]  This would disrupt calculation of parity prices.

48.     Several statutory programs require administrative use of parity prices.  For example, federal law requires USDA to pay certain growers the amount needed to provide a return that is "nearly equal to parity price."[50]  Therefore, parity prices allow the agricultural sector to weather shifts in the markets for agricultural products, protecting the national food supply and providing economic security to agricultural producers and to the workers they employ.

49.     Private entities also rely on parity prices and the parity index to structure contracts and manage economic risks.  For instance, many producer and contractor production agreements are set in reliance on the parity index.[51]  Agricultural production contracts permit farmers and contractors to secure dedicated supply relationships at predetermined prices as a means of managing financial and other risks inherent to agricultural production and food industry processing.[52]  Fair and efficient agricultural markets therefore require accurate information about agricultural prices

---

[48] USDA NASS, *Farm Labor: About the Survey*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Oct. 9, 2020).  NASS prepares a Prices Paid Index for Commodities and Services, Interest, Taxes and Farm Wage Rates (the "parity index") using (1) the wage rates paid to hired farm labor as reported in the Farm Labor Survey, (2) the Index of Production Items based on a survey of prices paid for agricultural chemicals, farm machinery, feeds, fuels, and retail seed, (3) interest paid and interest rate on farm indebtedness, (4) taxes paid on farm real estate, and (5) prices paid for family living items.  *See* USDA NASS, *Prices Paid Surveys and Indexes*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Prices_Paid_and_Prices_Paid_Indexes/ (last visited Oct. 9, 2020).
[49] 7 U.S.C. § 1301(a)(1)(C).
[50] 7 U.S.C. § 1303; *see also id.* § 602 (declaring it "to be the policy of Congress" for the Secretary of Agriculture "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices as defined by section 1301(a)(1)"); *id.* § 1282 (declaring congressional policy of "assisting farmers to obtain insofar as practicable, parity prices for [agricultural] commodities and parity of income"); *id.* § 1310(a) (mandating federal loans at 90% of parity price if the government suspends the sale of that agricultural commodity).
[51] *See* USDA NASS, *Prices Paid Surveys and Indexes*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Prices_Paid_and_Prices_Paid_Indexes/ (last visited Oct. 9, 2020).
[52] *See,* National Agricultural Law Ctr., *Production Contracts – An Overview*, https://nationalaglawcenter.org/overview/production-contracts (last visited Oct. 9, 2020).

and production costs incurred by farms to price production contracts, data that in part is only available through the FLS.

50.     Eliminating FLS data would prevent USDA from setting accurate parity indices for agricultural goods, thereby disrupting the numerous public programs and private contracts predicated on parity prices.  Shifting away from including wage data in the parity price calculation for the first time since the stabilizing tool was introduced in 1933 by the Agricultural Adjustment Act would be a major departure in established U.S. agricultural policy that would hurt farmers, their employees, and consumers by introducing unnecessary instability in a market long shielded from volatility.

4.     **FLS Data Is Critical To Understanding Farmworker Populations and Labor Market Trends**

51.     The FLS provides valuable data on farmworker labor trends, by surveying direct employment on farms, which assists USDA, DOL, and the agricultural sector to assess the labor needs of U.S. growers.  The FLS breaks down this information at a granular level, listing the number of workers hired by farms in a given quarter by standard occupational classification (*i.e.*, the type of farm work that the hired worker performs, such as equipment operation or fruit picking) along with the average wage paid to workers in those classifications.[53]  The FLS also breaks down the number of laborers hired and average wages paid by farms in various regions of the United States divided by the type of work done.[54]  These data thus present a comprehensive and timely picture of farm work labor trends in the United States.

52.     DOL's NAWS—which USDA identified as an alternative to the FLS—also relies on FLS data.  NAWS, using a relatively small sample of farmworkers, provides demographic, employment, and health information for U.S. crop workers that is crucial for government agencies and private parties interacting with this often-vulnerable population of essential workers.  However,

---

[53] *See, e.g.*, USDA, *Farm Labor* (May 28, 2020), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/n583zg017/dn39xm85z/fmla0520.pdf.
[54] *See id.*

DOL uses FLS data to construct and interpret NAWS.  For instance, DOL uses FLS data to assist in the statistical calculations undergirding NAWS.[55]

53.    Eliminating FLS data would therefore leave both public programs and private aid organizations blind to the identities and needs of their target populations, harming the delivery of much-needed support for workers who often subsist on low incomes and who lack many necessary social and economic resources.

**D.    Without The Farm Labor Survey, U.S. And Foreign Farmworkers Will Be Harmed**

54.    Estimates of the number of total farmworkers currently in the United States range from two to three million.  In 2019, the federal government approved the hiring of over 250,000 H-2A foreign guestworkers, meaning agricultural workers who permanently reside outside the United States but come to the United States on nonimmigrant visas to work at a particular job for up to ten months.[56]  These H-2A workers were employed in 2019 by approximately 13,000 agricultural employers in the United States.  In 2019, DOL certified over 23,000 H-2A positions in California.[57]

55.    Agricultural employers have continued to rely heavily on the H-2A program in 2020, and their substantial use of the program will likely continue in 2021.  During the first three quarters of the 2020 fiscal year, DOL received 12,351 applications from employers seeking certification for 232,362 H-2A workers and approved the hiring of 224,290 of those workers.  Washington State employers received approvals to hire 24,785 H-2A workers, and California employers received approvals to hire 21,337 H-2A workers.[58]

---

[55] Specifically FLS data are used to allocate NAWS data collection resources and to assign appropriate weights to sampled data so as to construct unbiased NAWS estimates for entire populations.  *See* DOL, *1205-0453: The National Agricultural Workers Survey, Part B*, https://www.dol.gov/sites/dolgov/files/ETA/naws/pdfs/NAWS_Statistical_Methods_AKA_Supporting_Statement_Part_B.pdf at 1-2, 6-7 (last visited Oct. 9, 2020).

[56] Costa & Martin, *Coronavirus and farmworkers: Farm employment, safety issues, and the H-2A guestworker program*, Economic Policy Inst. (Mar. 24, 2020), https://www.epi.org/publication/coronavirus-and-farmworkers-h-2a/.

[57] *Workers on Mexico's Export Farms*, Rural Migration News (Nov. 19, 2019), https://migration.ucdavis.edu/rmn/blog/post/?id=2367#:~:text=The%20hired%20workers%20employed%20in,165)%20a%20month%20in%202018.

56.     As described above, the FLS is critical to DOL's administration of the H-2A program and ensuring that both U.S. farmworkers and foreign guest workers are paid an appropriate minimum wage.  The DOL's H-2A program regulations require DOL to use the FLS to compute the AEWR, which is the wage paid by H-2A program employers to a vast majority of the farmworkers they hire, including both U.S. workers and the foreign guestworkers admitted to work in the United States under the H-2A program.

57.     The AEWR is a minimum wage rate that must be offered and paid to both U.S. and foreign workers by employers seeking permission to hire H-2A workers.  The AEWR is meant to protects U.S. workers' wages from decreasing in response to an influx of foreign guestworkers.  Under the H-2A program, however, employers can reject any job applicant, including a highly qualified U.S. farmworker, who demands a wage higher than the minimum rate required under the program.  Accordingly, those employers are not required to hire U.S. workers if those workers demand to be paid more than the H-2A minimum.  By shielding employers from being required to negotiate market wages, the program's "minimum" pay requirement often becomes the employer's maximum offer.  In areas with substantial numbers of H-2A workers, the AEWR can become a restraint on improvement in wages because H-2A workers often have limited ability to negotiate wage improvements and U.S. workers can be rejected if they do not accept the AEWR.

58.     Without the FLS, DOL is unable to publish the AEWR needed to administer the H-2A program.  And without the AEWR, under DOL regulations H-2A employers will be permitted to pay the next highest wage between either the prevailing wage rate in the local area of employment or the federal or state minimum wage.  As a result, H-2A workers and U.S. farmworkers working for H-2A program employers will be paid materially less than they would have if USDA had conducted the FLS and issued the annual FLR and DOL had published an AEWR based on that report.

59.     Most states do not collect, and therefore do not publish, local prevailing wage rates for jobs subject to the H-2A program.  In 2020, for instance, of the ten states with the most H-2A positions certified in 2019, eight did not publish any local prevailing wage rates at all, and the

COMPLAINT

remaining two only published a local prevailing wage rate for a single crop.[59]  And most states that did publish prevailing wage rates did not publish prevailing wage rates for general crop workers. Accordingly, in most circumstances, minimum H-2A wages will be determined by the highest of the federal minimum wage of $7.25 per hour or the applicable state minimum wage.

60.    Where H-2A employers are permitted to offer and pay the federal minimum wage, which is $7.25 per hour, U.S. and H-2A workers at H-2A employers will receive materially lower wages if USDA does not conduct the FLS and publish the annual FLR, and DOL does not establish an AEWR.

61.    Where the state minimum wage applies because it is higher than the federal minimum wage, the result will be materially lower wages for U.S. and H-2A workers at H-2A employers. Over 21,000 H-2A positions were certified in California through the third quarter of fiscal year 2020.  Those H-2A workers in California and U.S. workers at their employers were required to be paid a minimum wage of $14.77 under the AEWR published by DOL.  For most crops, California did not publish local prevailing wages for crop workers in 2020.  As a result, without the AEWR, the minimum wage paid at most H-2A employers in 2021 would be California's minimum wage of $14.00.  Eliminating the AEWR in 2021 therefore would result in wages that are at least $0.77 lower per hour than they otherwise would have been, causing U.S. and H-2A workers to be paid $30.80 less per 40-hour workweek, totaling $1,601.60 in lost income over the course of a year.[60]  This pay cut of more than 5% would create severe hardship for farmworkers, including UFW and UFW Foundation members.

62.    The wages of U.S. and H-2A workers at H-2A employers would be similarly depressed in Oregon, where many UFW members work.  DOL certified over 2,500 H-2A positions

---

[59] *See* Office of Foreign Labor Certification, *H-2A Temporary Agricultural Labor Certification Program - Selected Statistics, FY 2019*, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2A_Selected_Statistics_FY2019_Q4.pdf (last visited Oct. 9, 2020); U.S. Dep't of Labor, *Agricultural Online Wage Library* https://www.foreignlaborcert.doleta.gov/aowl.cfm (last visited Oct. 9, 2020).  In 2020, California published a local prevailing wage rate for wine grape harvesting and South Carolina published a rate for pine straw bailing and raking.

[60] This pay cut is substantial relative to an annual pre-tax income of only $27,040.  However, since these jobs are seasonal, actual annual incomes for these workers are often less than this figure.

through the first three quarters of fiscal year 2020.  Oregon's H-2A employers were obligated to pay at least $15.83 based on the 2020 AEWR.  Because DOL has not published prevailing wages for any regions in Oregon since 2011, eliminating the AEWR means that many H-2A workers in Oregon will be paid the state minimum wage (for non-urban areas) of $11.50 or $12.00 after the wage increases on July 1, 2021.  As a result, in 2020 Oregon's H-2A employers would have been permitted to pay $3.83 to $4.33 per hour less without the statewide AEWR, a $153.20 to $173.20 decrease in pay per 40-hour workweek, resulting in $7,966.40 to $9,006.40 in lost wages on an annualized basis.[61]  This amounts to approximately a 24% to 27% pay cut.

63.     Farmworkers in Idaho, including UFW members, would suffer even more severely. Through the first three quarters of fiscal year 2020, DOL certified 3,656 H-2A positions in Idaho. Idaho did not publish a local prevailing wage in 2020 (it has not published prevailing wages since 2014).  Accordingly, workers who would have been paid the $13.62 AEWR published by DOL in 2020 would instead have been paid the $7.25 state minimum wage (which is not scheduled to increase in 2021 or beyond).  Eliminating the AEWR would therefore result in U.S. and H-2A workers at H-2A employers being paid $6.37 less per hour, $254.80 less per 40-hour workweek. This corresponds to a pay cut of $13,249.60 over 52, 40-hour weeks, for an annual pre-tax income of only $15,080.  This would reduce farmworkers' income by more than 46%.[62]

64.     Even if DOL attempted to use other data sources to compensate for USDA's decision to eliminate the FLS, that shift would result in lower wages being paid to H-2A guest workers and U.S. farmworkers.[63]  For example, DOL recognized that relying on other data sources, instead of FLS data, to calculate the AEWR for a brief period in 2009 "resulted in the average certified wage

---

[61]     A farmworker paid the Oregon minimum wage for an entire year would earn an annual pre-tax income of only $23,460.

[62] Between 2015, and 2020, Idaho's AEWR increased by an average of 4.26% per year. *See* DOL, *AEWR Trends*, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/2c.%20AEWR%20TRends%20in%20PDF_12.16.19.pdf.  Assuming a similar increase in 2021, Idaho's AEWR would be $14.20, resulting in even greater losses to farmworkers' incomes if DOL is unable to publish AEWRs.

[63] DOL could not use alternative data sources for AEWR calculation without promulgating a new rule, because the H-2A program regulations define the AEWR calculation methodology in terms of the FLS data. *See* 20 C.F.R. § 655.103.

for H-2A workers decreasing nationwide to $8.02 per hour, an 11.2 percent decrease compared to the $9.04 per hour average for FY 2009 applications that" calculated the AEWR using FLS data, "and a 10.8 percent decrease compared to the $9.00 per hour average wage rate for FY 2008 applications" that all relied on FLS data.[64]   Indeed, only seven states did not see average H-2A wages fall during that period, and those states accounted for less than 2.4% of the total H-2A workers certified during that time.[65]

## CLAIMS FOR RELIEF

### Count One (Violation of Administrative Procedure Act, 5 U.S.C. § 706)

#### *USDA Failed To Consider Important Aspects Of The Decision*

65.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

66.   The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).   Agency action that is not the product of reasoned decisionmaking is arbitrary and capricious.   *See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   An agency that "entirely fail[s] to consider an important aspect of the problem" before it has acted in an arbitrary and capricious manner.   *Id.*; *see also Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020).

67.   USDA's decision to discontinue the Farm Labor Survey and cease publication of the Farm Labor Report is a final agency action that is arbitrary and capricious because it "entirely fail[s] to consider … important aspect[s] of the problem" before the agency.   *State Farm*, 463 U.S. at 43.   For example, USDA's notice stating that it will no longer conduct the Farm Labor Survey fails to consider the significant effects that the decision will have on farmworkers whose wages are based in part on the wages reported in the Survey.

68.   USDA's decision is also arbitrary and capricious because it "fail[s] to address" the "serious reliance interests" implicated by discontinuing the long-standing survey that it has

---

[64] *Temporary Agricultural Employment of H–2A Aliens in the United States*, 75 Fed. Reg. 6884, 6896-6897 (Feb. 12, 2010).

[65] *Id.* at 6897.

repeatedly and consistently recognized is integral to assessing farm labor in the United States and fulfilling various federal policy objectives.  For example, USDA's notice fails to address the impact its decision will have on DOL's ability to calculate the Adverse Effect Wage Rates used to determine appropriate farmworker compensation under the H-2A program.  USDA also failed to address the impact discontinuing the survey would have on the other federal, state, and local agencies that rely on Farm Labor Survey data to make policy decisions concerning farm labor and agricultural production.

69.     For these reasons and others, USDA's decision to discontinue the Farm Labor Survey and cease publication of the Farm Labor Report must be vacated and "set aside" as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

**Count Two (Violation of the Administrative Procedure Act, 5 U.S.C. § 706)**

***USDA Failed To Offer A Reasoned Explanation For Its Decision***

70.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

71.     The APA requires this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion … or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).  Agency action that is not the product of reasoned decisionmaking is arbitrary and capricious.  *See State Farm*, 463 U.S. at 43.  To satisfy that core requirement, an agency must "cogently explain why it has exercised its discretion in a given manner."  *Id.* at 48.

72.     USDA's decision fails this statutory requirement.  The Notice reflects virtually no reasoned decision making.  The Notice provides no rationale for ending FLS data collection or Farm Labor Report publication.  The Notice acknowledges several ways that FLS data are used, but it does not so much as acknowledge—let alone rationally grapple with—the administrative disruptions and severe economic hardship this suspension will produce.  And while the Notice asserts that alternative data sources can substitute for FLS data, it provides no explanation for how these other surveys will replace the many unique attributes of FLS data. The Notice even suggests, irrationally, that NAWS data set could serve as a substitute, even though the calculation of NAWS

1   data relies on FLS data as a crucial methodological input and is not a comprehensive survey similar

2   to FLS.

3       73.     For these reasons and others, USDA's decision must be vacated and "set aside" as a

4   final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

5   accordance with law."  5 U.S.C. § 706(2)(A).

6       **Count Three (Violation of the Administrative Procedure Act, 5 U.S.C. § 553)**

7       ***USDA Violated The APA's Requirement Of Notice-And-Comment Rulemaking***

8       74.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

9       75.     The APA requires this Court to hold unlawful and set aside any agency action taken

10  "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

11      76.     The APA, 5 U.S.C. § 553, requires (with certain exceptions not applicable here) that

12  agencies publish notice of any proposed substantive rule in advance in the Federal Register, and that

13  the public is given an opportunity to comment on proposed rules before they take effect.

14      77.     USDA's decision to discontinue the Farm Labor Survey amounts to a "rule" within

15  the meaning of the APA because it is an "agency statement of general or particular applicability and

16  future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).

17      78.     USDA's decision to discontinue the FLS is not an "interpretative rule[], general

18  statement[] of policy, or rule[] of agency organization, procedure, or practice."  5 U.S.C. § 553(b).

19  To the contrary, it is a substantive rule that alters growers' and farmworkers' rights and obligations

20  under the law.

21      79.     Absent "good cause" for not doing so, USDA was required to provide notice of its

22  decision, an opportunity for public comment, and an explanation of the rule ultimately adopted, *see*

23  5 U.S.C. § 553(b), (c)—none of which it has done.

24      80.     USDA has made no reasoned "good cause" finding for failing to follow the APA's

25  procedural requirements here, nor could it.

26      81.     Because USDA discontinued the Farm Labor Survey and Farm Labor Report without

27  notice and comment, in violation of 5 U.S.C. § 553, that action is unlawful and must be vacated.

28

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully seek the following relief:

1.     A temporary restraining order and an order for preliminary and permanent injunctive relief preventing Defendants from discontinuing the Farm Labor Survey and preventing Defendants from failing or refusing to issue a Farm Labor Report in or about November 2020 based on the Farm Labor Survey;

2.     An order vacating and setting aside the decision to discontinue the Farm Labor Survey and to cease publication of the Farm Labor Report;

3.     A declaration that the decision to discontinue the Farm Labor Survey and stop publication of the Farm Labor Report is unlawful;

4.     A declaration that discontinuing the Farm Labor Survey and Farm Labor Report without undertaking notice-and-comment rulemaking is unlawful under the Administrative Procedure Act;

5.     An order awarding Plaintiffs their costs and attorney's fees;

6.     Any and all other such relief as the Court may deem appropriate.

DATED:  October 13, 2020                     Respectfully submitted,

*/s/  Joseph Taylor Gooch*
JOSEPH TAYLOR GOOCH (SBN 294282)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1 Front Street, Suite 3500
San Francisco, California 94111
Telephone:     (628) 235-1000
Facsimile:     (628) 235-1001
Taylor.Gooch@wilmerhale.com

*Attorney for Plaintiffs*

COMPLAINT